***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Hall. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Hall with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to the North Carolina Workers' Compensation Act. All parties are properly before the North Carolina Industrial Commission and the Commission has jurisdiction over the parties and the subject matter.
2. Plaintiff was engaged in an employment relationship with defendant-employer in the state of North Carolina on or about the date of the alleged injury, which the parties stipulate was May 30, 2003.
3. Plaintiff has been out of work since June 2, 2003 continuing through the present date.
4. Plaintiff's average weekly wage at the time of her injury was $400.00, yielding a compensation rate of $266.68.
 ***********
Based upon all of the competent evidence of record, the undersigned makes the following:
 FINDINGS OF FACT
1. Defendant employed plaintiff on or about May 30, 2003 in Sanford, North Carolina.
2. Defendant-employer is a Virginia corporation based out of Bedford, Virginia, whose business involves the installation of cable television equipment.
3. On or about March 20, 2003, defendant-employer took over a contract held by plaintiff's former employer, H H Cable Contractors, which called for defendant-employer to install cable television equipment in Sanford, North Carolina and the surrounding areas.
4. Defendant-employer hired plaintiff to continue working as a dispatcher for them at their Sanford, North Carolina operation. Plaintiff's job duties were to radio dispatch cable television installation assignments to the installers, report progress of said work, enter completed jobs into a computer system, and prepare equipment for the installers to pick-up at the office.
5. Defendant-employer operated out of the Charter Communications building in Sanford, North Carolina and regularly employed between six and seven employees in the Sanford, North Carolina office prior to and on May 30, 2003. This number rose to fourteen employees counting defendants' employees working in the Erwin, North Carolina area. Plaintiff also dispatched for defendants' employees working in Erwin.
6. On or about May 30, 2003, plaintiff was the person primarily responsible for preparing cable boxes for the installers to pick up the following workday. Each cable box weighed approximately ten pounds.
7. On May 30, 2003, plaintiff was on duty and working for defendant-employer in the Charter Communications building in Sanford, North Carolina.
8. Between 3:00 p.m. and 3:30 p.m. that day, plaintiff began to prepare cable boxes for pick up the following morning. Plaintiff attempted to lift a stack of four to five cable boxes from a waist-high countertop. As she lifted the boxes, plaintiff felt a sudden pull and sharp pain in her neck. Plaintiff told Kathy, an employee with Charter Communications sitting nearby, that she had hurt her neck. Plaintiff finished work that day at 5:00 p.m. or 6:00 p.m., but did not lift any more boxes.
9. Over the ensuing weekend, plaintiff's neck pain and stiffness increased. She was unable to fully turn her neck and she began experiencing tingling in her hands and arms.
10. On June 2, 2003, plaintiff reported to work, but was unable to perform her duties due to her continued neck pain.
11. Around 3:30 p.m. that day, after notifying a co-worker, plaintiff sought treatment at the emergency room of Central Carolina Hospital in Sanford, North Carolina. She informed the attending physician that she had injured her neck three days prior while "lifting cable TV decoder boxes." She told them the pain and pulling had gotten worse since the initial injury. The attending physician initially diagnosed a cervical muscle strain and prescribed plaintiff with Motrin and Flexeril. He told plaintiff to follow-up with Dr. James Little of Sanford, North Carolina.
12. On June 3, 2003, plaintiff telephoned her immediate supervisor with defendant-employer at the time, Mr. Jamek Facundo, who was located in the defendant's Virginia office. Plaintiff informed Mr. Facundo that she had injured her neck the previous Friday at work. Mr. Facundo told plaintiff to telephone Mr. Jon Jackson, Vice-President of JWS, to report the workers' compensation injury.
13. On June 3, 2003, plaintiff called Mr. Jackson's office in Bedford, Virginia and spoke to Mona, his secretary. Plaintiff informed Mona that she had injured her neck at work the previous Friday and needed to report the workers' compensation claim to Mr. Jackson. Mona told plaintiff that Mr. Jackson would get back in touch with her.
14. After receiving no response for several days, plaintiff called Mona at Mr. Jackson's office again on June 6, 2003. Plaintiff spoke with Mr. Jackson that day and informed him of her on-the-job injury from the previous Friday. Mr. Jackson stated that either he or Elizabeth Jackson, President of JWS Communications and Mr. Jackson's wife, would contact plaintiff in the near future with an insurance claim number.
15. Plaintiff spoke with Ms. Elizabeth Jackson on June 9, 2003, at which time Ms. Jackson provided plaintiff with a Travelers Insurance claim number. Plaintiff contacted a claims representative for Travelers, who informed plaintiff that their policy with JWS Communications did not cover plaintiff or her injury.
16. Plaintiff contacted Mr. Jackson with this information. Mr. Jackson told plaintiff he would "look into it." After weeks of inactivity and no benefits, plaintiff filed for a hearing in this matter.
17. Jon Jackson testified that he was familiar with workers' compensation insurance and that he was involved in obtaining workers' compensation insurance for JWS. He testified that he had coverage in Virginia since the inception of JWS.
18. Mr. Jackson testified that Brad Burley had been his insurance agent for his house and auto, and when he started JWS, he spoke to Mr. Burley regarding insurance for the business. The testimony of Mr. Jackson was that Mr. Burley placed coverage for Mr. Jackson's auto with Allstate, initially placed JWS' workers' compensation coverage with The Hartford and when that coverage was canceled, Mr. Burley placed JWS' workers' compensation coverage with Travelers Insurance Company through an assigned risk pool. Mr. Jackson testified that Mr. Burley was an agent with Bedford Insurance Associates. There has been no evidence offered that Mr. Burley was an agent for Travelers Insurance Company.
19. There is no evidence in the case before the undersigned that plaintiff's wages were used in computation of JWS' premiums, that Mr. Burley was as familiar with JWS' business operation, or that JWS detrimentally relied on Mr. Burley's expertise.
20. Mr. Jackson testified that JWS begin operating its business in North Carolina on March 15, 2003 with two employees and then added five more. JWS began work in North Carolina without having coverage in place for its North Carolina employees as evidenced by the Travelers Workers' Compensation and Employers Liability Policy number 6JUB-697X214-9-02. The policy clearly states in paragraph 3.A. that coverage is only in Virginia with a Residual Market Limited Other States Insurance Endorsement that contains the following language in bold print:
IMPORTANT NOTICE!
 If you hire any employees outside those states listed in Item 3.A. on the Information Page or begin operations in any such state, you should do whatever may be required under that state's law, as this endorsement does not satisfy the requirements of that state's workers compensation law.
21. Mr. Jackson testified that JWS initiated operations in North Carolina on March 15, 2003 and ceased operations in North Carolina on June 10, 2003. Based on these dates, JWS was without workers' compensation insurance coverage in North Carolina for 88 days.
22. While waiting to hear from Mr. Jackson about workers' compensation insurance, plaintiff followed up with Dr. James Little on June 5, 2003. Dr. Little initially diagnosed a cervical neck strain. He supplied plaintiff with a neck brace and prescribed pain medication. Eventually, Dr. Little recommended that plaintiff seek treatment from a neurologist for her chronic neck pain. Dr. Little also wrote plaintiff out of work indefinitely, retroactive to June 5, 2003, due to what was eventually discovered to be a cervical disc herniation.
23. Plaintiff eventually saw Dr. Chad Prusmack of Triangle Neurosurgery on October 3, 2003 for her ongoing cervical neck condition. Dr. Prusmack recommended a cervical spine MRI and a follow-up visit after the MRI. He also prescribed Flexeril and Vioxx for plaintiff's pain and neck inflammation.
24. Plaintiff underwent a cervical spine MRI on October 23, 2003 at Wake Radiology in Raleigh, North Carolina. Defendant-employer paid for this procedure. The MRI showed that plaintiff was suffering from early multilevel spondylosis from the C3-4 through C6-7 vertebras. It also showed a central disc bulge and osteophytic spurring resulting in mild indentation of the ventral spinal cord at C3-4 and C4-5. Moderate broad spondylitic ridging and a slight central disc protrusion were moderately compressing the ventral spinal cord at C5-6 and there was mild bilateral foraminal encroachment at that level. Finally, there was a slight central disc protrusion at C7-T1, minimally indenting the ventral spinal cord.
25. On October 24, 2003, plaintiff followed up with Dr. Prusmack. Dr. Prusmack diagnosed plaintiff as suffering left C5-6 radiculopathy secondary to spondylosis and a herniated disc. He recommended surgical fusion to cure the condition and relieve plaintiff's pain. He also wrote plaintiff out of work indefinitely until after he is able to perform surgery.
26. After Dr. Prusmack's surgical recommendation, defendant-employer requested that plaintiff see Dr. James Fulghum at Carolina Back Institute for a second opinion evaluation. Dr. Fulghum saw plaintiff on November 17, 2003. He concurred with Dr. Prusmack's diagnosis and fusion surgery recommendation.
27. The surgical procedure recommended by Dr. Prusmack is medically necessary to lessen plaintiff's pain and give her relief from the symptoms of her back condition. Without this surgical procedure, it is possible that plaintiff's condition could worsen, resulting in increased pain, weakness and sensory loss.
28. According to Dr. Prusmack, there was no other treatment other than surgery that he would recommend for plaintiff at this time. He further testified that, in his opinion and to a reasonable degree of medical certainty, "that both the spondylosis and herniated disk in combination are contributing to plaintiff's symptoms."
29. Prior to her May 30, 2003 injury, plaintiff was not experiencing any pain in her neck. Plaintiff had not experienced any neck problems in the past besides isolated muscle spasms she experienced in October 1996 and April 1998. She had not sought any medical treatment for her neck condition since the 1996 muscle spasm, and she never experienced any neck pain or related symptoms like those stemming from her May 30, 2003 injury.
30. Dr. Prusmack's opined to a reasonable degree of medical certainty, and the undersigned so finds, that both the spondylosis and herniated disk in combination are contributing to plaintiff's neck pain symptoms.
31. According to Dr. Prusmack, plaintiff has been totally disabled since the date of her neck injury and should not attempt any type of trial return to work prior to the surgery he recommended.
32. Defendant-employer has paid plaintiff all temporary total disability benefits accrued to date and all medical expenses associated with her neck injury incurred to date. However, these payments were not initiated until plaintiff, after having received no response from defendant-employer regarding her claim, filed a request for a hearing before the Industrial Commission and the parties had gathered for the first setting of this hearing on October 24, 2003, five months after plaintiff notified defendant-employer of her injury and claim.
33. Defendant-employer has not authorized or paid for the surgery recommended by Dr. Prusmack, despite the opinions and recommendations reached by both Dr. Prusmack and Dr. Fulghum. As a result, plaintiff has not been able to undergo this necessary medical treatment.
34. Despite the medical evidence known to them, including their own medical second opinion, defendant-employer wholly denied plaintiff's claim in this matter on December 1, 2003, necessitating this ongoing hearing process. Defendants, including JWS, have offered virtually no evidence refuting plaintiff's claim or its compensability, needlessly prolonging not only plaintiff's recovery and extending her pain and disability.
35. Plaintiff's counsel has spent in excess of 70 hours on this case through the time of the hearing before the deputy commissioner. This time has been spent on numerous client consultations; numerous communications with defendant-employer and, later, defendant's counsel; communications with carrier's counsel; communications with medical providers; preparation for and travel to Raleigh, North Carolina for the scheduled October 24, 2003 hearing; obtaining discovery and preparing responses to defendant and carrier's discovery requests; preparation for and travel to Raleigh, North Carolina for the February 11, 2004 hearing; preparation for and travel to Raleigh, North Carolina for the February 25, 2004 deposition of Dr. Chad Prusmack; research and drafting plaintiff's brief and Contentions. Further, plaintiff's counsel has also spent time responding to defendant-employer's appeal to the Full Commission.
36. Any employer required to secure the payment of compensation who refuses or neglects to secure such compensation shall be punished by a penalty of one dollar ($1.00) for each employee, but not less than fifty dollars ($50.00) nor more than one hundred dollars ($100.00) for each day of such refusal or neglect, and until the same ceases pursuant to N.C. Gen. Stat. § 97-94(b).
37. JWS failed to purchase workers' compensation insurance as required by N.C. Gen. Stat. § 97-93 to cover his employees for 88 days during the time period beginning March 15, 2003 through June 10, 2003. JWS had the ability and authority to bring his business into compliance with N.C. Gen. Stat. § 97-93 and may be assessed a penalty equal to 100% of the amount of compensation due JWS' employees injured during the time his business failed to comply with N.C. Gen. Stat. § 97-93 as set out in N.C. Gen. Stat. § 97-94(d).
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 30, 2003, plaintiff suffered a compensable injury by accident to her cervical spine due to a specific traumatic incident arising out of and in the course and scope of her employment with JWS. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to temporary total disability compensation at the rate of $266.68 per week from the original date of injury of May 30, 2003 and continuing until such further Order of the Commission, subject to a credit to JWS for any previously paid temporary total disability compensation. N.C. Gen. Stat. § 97-29.
3. Unlike the McKinnon v. L S Holding Co., 156 N.C App. 697,___ S.E.2d ___, (2003) case cited by JWS, there is no evidence in the case before the undersigned that plaintiff's wages were used in computation of JWS' premiums as was the case in McKinnon, that Mr. Burley was as familiar with JWS' business operation as the agent in McKinnon, or that JWS detrimentally relied on Mr. Burley's expertise as L S Holding Co. did on their agent with respect to the insurance classification codes inMcKinnon. Id.
4. Plaintiff is entitled to have JWS pay for all medical expenses incurred or to be incurred by plaintiff as a result of her compensable work injury that may reasonably be required to effect a cure, provide relief or lessen plaintiff's period of disability, including any recommended diagnostic testing, medications, and spine fusion surgery recommended by Dr. Chad Prusmack, plaintiff's authorized treating physician. N.C. Gen. Stat. § 97-25.
5. Any employer required to secure the payment of compensation who refuses or neglects to secure such compensation shall be punished by penalty of One Dollar ($1.00) for each employee, but not less than Fifty Dollars ($50.00) nor more than One Hundred Dollars ($100.00) for each day of such refusal or neglect, and until the same ceases. JWS was subject to the Workers' Compensation Act and operating in North Carolina for 88 days without the coverage required by the Act. N.C. Gen. Stat. § 97-94(b).
6. JWS has engaged in stubborn, unfounded litigiousness in its delay, denial, and ongoing litigation regarding the compensability of plaintiff's claim and the benefits to which she is entitled, beginning with the filing of a Form 61 denying the claim. N.C. Gen. Stat. § 97-88.1.
7. JWS failed to purchase workers' compensation insurance as required by N.C. Gen. Stat. § 97-93 to cover his employees for 88 days during the time period beginning March 15, 2003 through June 10, 2003. JWS had the ability and authority to bring the business into compliance with N.C. Gen. Stat. § 97-93 and may be assessed a penalty equal to 100% of the amount of compensation due JWS' employees injured during the time his business failed to comply with N.C. Gen. Stat. § 97-93. N.C. Gen. Stat. § 97-94(d).
 ***********
Based upon the foregoing findings of fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. JWS shall pay plaintiff ongoing temporary total disability benefits at a rate of $266.68 per week retroactive to May 30, 2003 and continuing until plaintiff returns to work or until further Order of the Commission, subject to a credit to JWS for any temporary total disability paid prior to the entry of this Opinion and Award.
2. JWS shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her compensable work injury, for so long as such treatment tends to effect a cure, provide relief, or lessen the period of plaintiff's disability, including any recommended diagnostic testing and medications. Specifically, JWS shall immediately authorize and pay all medical expenses associated with the cervical spine fusion surgery recommended by Dr. Chad Prusmack.
3. JWS shall pay a reasonable attorney's fee and costs to plaintiff's counsel incurred as a result of defendants' stubborn, unfounded litigiousness of plaintiff's claim. This amount shall not be deducted from the compensation awarded to plaintiff. Plaintiff's counsel shall submit a statement of attorney hours involved in this matter to the undersigned, beginning at the time of filing of the initial Form 61 Denial, up to and including the appeal to the Full Commission. Thereafter, the undersigned will issue an order as to the amount to be paid plaintiff's counsel.
4. Pursuant to N.C. Gen. Stat. § 97-94(b), a civil penalty in the amount of $4,400.00 is hereby assessed against JWS for their failure to maintain workers' compensation coverage on his employees for a total of 88 days for the time period March 15, 2003 through June 10, 2003. The N.C. Gen. Stat. §§ 97-94(b) and 97-94(d) penalties will be held in abeyance pending negotiations between JWS and the Office of the Attorney General.
5. JWS shall pay the costs.
This the ___ day of ___ 200___.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER